UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal Nos. 06-CR-10408-RGL |
| v. | ) | 06-CR-10420-WGY |
| | ) | 06-CR-10421-RGS |
| OVERSEAS SHIPHOLDING GROUP, INC., | ) | 06-CR-10422-JLT |
| | ) | 06-CR-10423-RGS |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S AMENDED MOTION FOR WHISTLEBLOWER AWARDS**

The United States moves this Court pursuant to the Act to Prevent Pollution from Ships

("APPS"), 33 U.S.C. 1908(a), to authorize payments of $437,500 to each of the twelve

whistleblowers whose assistance led to the successful prosecution of this case.  As grounds for

the Motion, the government states as follows:

**I.      Potential Applicability of Whistleblower Rewards**

The criminal penalty provision in APPS authorizes payment of a whistle-blower award.

Specifically, the statute states:

> Criminal penalties.  A person who knowingly violates the MARPOL Protocol,
> Annex IV to the Antarctic Protocol, this Act, or the regulations issued thereunder
> commits a class D felony. *In the discretion of the Court, an amount equal to not
> more than ½ of such fine may be paid to the person giving information leading to
> conviction.*

33 U.S.C. § 1908(a) (emphasis added).  Pursuant to the plea agreement, Defendant Overseas

Shipholding Group, Inc. ("OSG") will be convicted of a total of 33 felony counts and pay a total

of $37 million, of which $27.8 will be treated as criminal fines and $9.2 as organizational

community service.  Of the $27.8 million in criminal fines, $10.5 million will be attributable to

APPS violations.  Therefore, under Section 1908(a) there is $5.25 million from which the court

can award to those persons who provided information that resulted in OSG's convictions.  While

each crew member provided specific information leading to specific counts, each individual and

individual case also contributed to the overall settlement.  Because the differences in relative

contributions of the twelve whistleblowers are not extremely significant, the United States

proposes that the Court apportion the award equally among the whistleblowers.[1]

The APPS whistleblower award provision serves a valuable law enforcement purpose.

Deliberate violations of MARPOL and United States law are far too common. Criminal conduct

that takes place within the small community of those living and working aboard vessels is

difficult to detect.  This reward provision is not unique.[2]  The availability of the APPS award

aptly reflects the realities of life at sea and the pollution of the oceans.   Because the pollution

takes place in the middle of the ocean and usually at night, the only people likely to know about

the conduct and the falsification of ship records used in port are the employees in the engine

room.  Employees in this case, like those in other similar prosecutions, have indicated that they

fear retaliation not just by their employer, but by manning agencies and other companies.  They

have a palpable fear of being blacklisted from future employment in the maritime industry.  Each

year, thousands of seafarers participate in or are aware of illegal conduct aboard their vessels.  A

tiny minority choose to take active measure to stop the wrongdoing and bear witness.  The

---

[1]Each of the individuals is a foreign crew member who is represented by counsel in the United States.  The government has contacted individual defense counsel for each of these whistleblowers to provide notice of the sentencing and will provide each counsel with a copy of this pleading.  The United States, OSG and individual counsel also have contact information for these crew members.  The government has also shared this proposal with Defendant OSG.

[2]*See, e.g.,* Refuse Act, 33 U.S.C. § 411; CERCLA, 42 U.S.C. § 9609(d); Endangered Species Act of 1973, 16 U.S.C. §1540(d); Bald and Golden Eagle Protection Act, 16 U.S.C. § 668(a); Internal Revenue Service, 26 U.S.C. § 7623; Tariff Act, 19 U.S.C. § 1619.

government's success in identifying the activity and obtaining sufficient evidence to support

investigations and prosecutions is dependent on the willingness of lower level crew members to

step forward.  The decision to step forward, however, must be weighed against the likelihood

that the cooperating crew member will forever be barred from working in the marine shipping

industry and may be subject to physical harm and abuse.  In fact, several crew members in this

case perceived that their employment was threatened and/or their physical safety was in jeopardy

as a direct result of blowing the whistle on crime.  For many of these individuals, their fears,

whether justified or not, were readily observable during debriefings with government

representatives, even with the assistance of counsel.  A substantial monetary award both rewards

the crew member for taking that risk and may provide an incentive for fellow crew members to

alert inspectors and investigators of similar conduct on other ships in the future.

For these reasons, significant whistleblower awards have become a routine practice

where the facts support a reward.[3]  *See, e.g.,* Order, *United States v. Irka  Maritime, S.A.*

---

[3]A review of similar cases involving marine vessel pollution and whistle-blowers indicates the following awards have been given: *United States v. Irka  Maritime, S.A.*, (W.D.WA. 2007) (court awarded one-half of $500,000 criminal fine to second engineer who reported illegal discharges and falsified records to Coast Guard); *United States v. Wallenius Ship Management Pte.* (D.N.J. 2006) (court awarded one-half of $5 million fine to be divided among four crew members who sent a fax to an international seafarers' union alleging that they were being ordered to engage in deliberate acts of pollution); *United States v. Sun Ace Shipping Company et al.*, (D.N.J. 2006) (court awarded half of a $200,000  fine to be divided among three whistleblowers, two Oilers and a Wiper, who lodged complaints with a religious organization that they were being forced to bypass pollution control equipment); *United States v. MK Shipmanagement Company, Ltd.*, (D. N. J. 2006) (court awarded half of a $200,000 fine to be split between two whistleblowers, $75,000 was awarded to the Third Engineer for presenting photos and records documenting illegal discharges; $25,000 was awarded to the ship's cook who contacted the government); *United States v. OMI*, (D. N.J. 2004) (court awarded one-half of a $4.2 million criminal fine to a Second Engineer who upon arrival asked for directions to local police department and reported illegal discharges and falsified records); *United States v. Sabine Transportation*, (D. Iowa 2004) (court awarded three employee whistleblowers one-half of $2.0

*(W.D.WA 2006)* (No. CR06-5661RBL) (holding an award "would be consistent with the

manifest purpose of the statute of encouraging those with information about unlawful conduct to

come forward and disclose that information to authorities.").

In what follows, the government has outlined the contributions of key whistleblowers

who in the government's view provided information that resulted in conviction.  It is worth

noting that during this prosecution not one of these individuals mentioned or requested a reward

for providing information.  Similarly, the government did not inform these individuals of the

applicability of an award during the investigation.  The government respectfully submits that the

record shows that the whistleblowers identified below provided information leading to

conviction.

## II.     Whistleblower Contributions

---

million criminal fine); *United States v. Botelho Shipping Corp.*, (D. Oregon 2003)(court awarded
crew member who passed note to investigators disclosing overboard discharges of oil
contaminated waste water $225,000, or one-half of the criminal fine issued for an APPS
violation); *United States v. Norwegian Cruise Lines* (S.D. Fla. 2002) (court awarded a former
employee whistleblower $250,000, which was one quarter of the $1 million criminal fine, for
informing the EPA about unlawful discharges and false statements in the Oil Record Book of the
*S.S. Norway* cruise ship); *United States v. D/S Progress* (D. Md. 2002) (court awarded two
employee whistleblowers with half of the $250,000 criminal fine under APPS for slipping a
handwritten note to a U.S. Coast Guard inspector that disclosed a crack in the hull of an oil
tanker and which resulted in the discovery of other violations); *United States v. Holland
America*, (D. Alaska 1999) (court awarded a whistleblower crew member with one half of the $1
million criminal fine for informing the government of the unlawful discharges of waste oil in
violation of APPS); *United States v. Crescent Ship Services* (E.D. La. 1995) (court rewarded a
company whistleblower with half of the $250,000 fine for conspiracy to violate APPS); *United
States v. Regency Cruises, Inc*. (M.D. Fla. 1995) (court split one half of the $250,000 fine among
two different witnesses who reported the pollution to the government); *United States v. Princess
Cruise Lines* (S.D. Fla. 1993) (court awarded cruise ship passenger with one half of the $500,000
criminal fine for providing the government with a video tape of crew members dumping plastic
bags of garbage into the ocean).

As set forth below, the following individuals provided information leading to OSG's conviction:

1.  Wilfredo Larutin.  Mr. Larutin was the Fitter on the M/T Uranus.  He was ordered to create a bypass pipe in April 2003 by the ship's Chief Engineer and First Engineer.  He objected and told the officers that what they were doing was illegal and dangerous because the ship's itinerary was so close to the United States.  He was told that if he did not follow orders, he would be sent home with a negative personnel evaluation which he understood could adversely impact his ability to work again in the maritime industry.  According to Mr. Larutin, he attempted to talk with the Master who interrupted him before he could even explain and directed him to return to the engine room.

Mr. Larutin made the pipe under protest, but was so outraged by illegal dumping close to the New England coastline that he created a secret journal inside another log book.  When he arrived in the United States to testify before the grand jury in Boston, Mr. Larutin appeared with his journal.  He freely offered the journal to prosecutors.  When asked why he kept the journal, he responded that he thought it would be needed some day.  Mr. Larutin's journal included contemporaneous recordings of his being ordered to manufacture the bypass, specific dates of alleged overboard discharges with the use of the bypass pipe, as well dates of other alleged MARPOL violations.

Mr. Larutin was debriefed by agents and prosecutors and testified before the grand jury. His contemporaneous record, combined with corroborating testimony obtained from a number of other crew members, greatly contributed to the strength of the government's case.  The discharges from the *M/T Uranus* were particularly egregious because they involved both sludge

and oil-contaminated bilge waste.  During his time on the ship, a crew member reported the

illegal conduct to a third party who, in turn, passed the information on to the Coast Guard.  That

tip led to a  boarding in Boston on June 18, 2002, to determine the ship's compliance with

MARPOL.  The Coast Guard inspectors were presented with a falsified Oil Record Book that

failed to disclose the use of the bypass and falsely represented the use of the Oily Water

Separator.  It is not known whether Mr. Larutin was the whistleblower who provided this tip, but

his information also provided critical evidence to demonstrate that OSG obstructed this agency

inspection.

2.  Gyu Yong Lee.  Mr. Lee was the First Engineer of the M/T Overseas Shirley.  In

2002, he wrote an anonymous letter to the company's senior most ship manager in England

regarding illegal conduct that had taken place on the ship.  His letter was extremely detailed and

alleged that the Chief Engineer of the M/T Overseas Shirley had refused to incinerate sludge and

that it was instead discharged directly overboard.  The discharges allegedly were made with the

use of a bypass hose, photographs of which were included with the letter.  According to Mr.

Lee's letter, during a subsequent period, waste sludge from the vessel's engine room was also

transferred to the ship's deck department without being recorded in the Oil Record Book.  In

pertinent part, his letter alleged that "[a]ll sludge & oily bilge in engine room discharged directly

to sea" through a bypass upon the Chief Engineer's orders.  "For these reason present C/E . . .

must be dismissed this company and also punished by national regulation. If you do not agree

and action promptly to this proposal, we will accuse CE . . . of M/T Overseas Shirley to U.S.

coast guard as a habitual criminal of illegal sludge discharge to sea."

Mr. Lee's letter estimated that 153 cubic meters (40,600 gallons) of sludge generated

over in a 204 day period, were pumped directly overboard through the bypass instead of being

incinerated.  OSG discounted Mr. Lee's allegations for various reasons, including his admitted

hostility against the Chief Engineer.  Mr. Lee's allegation concerning unrecorded internal

transfers caused OSG to make a "corrective entry" in the Oil Record Book.

Mr. Lee's letter was produced pursuant to subpoena in Boston.  The government

conducted its own review of the evidence and, with OSG's assistance, Mr. Lee agreed to make

two trips to the United States to meet with prosecutors and testify before the grand jury.  The

government's investigation also included contacting another crew member specifically identified

as a witness in Mr. Lee's letter to OSG.  This individual corroborated Mr. Lee's allegations.

3.  <u>Julius As-Il</u>.  Mr. As-Il was the Second Engineer of the M/T Overseas Portland.

When the ship arrived in Portland, Maine, on December 20, 2005, Mr. As-Il slipped a note to a

terminal employee and specifically requested that he give it to the Coast Guard.  On one side of

the note, he wrote:

> [S]end your men to inspect our oily water separator.  The chief engr. is bypassing
> the oil content monitor during operation by inserting screwdriver on the manual
> activation button of the solenoid valve for overboard.  The solenoid valve is
> secured on the OWS with plastic straps on each end.  One end the straps cover
> directly on top of the manual button.  This is where the C/E insert the screwdriver
> ... in between the straps and the botton, in effect the botton is keep pushed and the
> overboard v/v is always open, regardless of how much ppm on the OCM [Oil
> Content Meter].  (Ellipses in the original).

On the other side of the slip of paper, he wrote: "Pls. Make it appear like it's a routine

inspection. Keep my i.d. secret."  He also added: "I have pictures/evidence/and other witnesses.

(Some of them are about to sign off.)."

The oil terminal employee did not notify the Coast Guard, but rather, passed the

allegations to his supervisor who, in turn, notified a shore-based manager with OSG who was

attending the vessel in Portland.  On a parallel track, Mr. As-Il also attempted to alert OSG, and, with the aid of the ship's cook, contacted the same OSG manager.  Mr. As-Il met with the OSG manager on the ship that night and alleged the Chief Engineer had been making improper overboard discharges.  He also provided a disc containing photographs and written allegations. The written notes given to OSG's shore-based manager on December 20, 2005, allege that the Chief Engineer had been involved in surreptitiously tricking the overboard valve with a screwdriver.

At the government's request, and OSG's assistance, Mr. As-Il traveled back to the United States and provided information that led to OSG's guilty plea.  His acts were particularly courageous in that the Chief Engineer of this vessel was not just a Chief Engineer, but also a former long-term shore-based superintendent for OSG.  His preparation of records and attempt to provide that information directly to the Coast Guard as well as to his employer demonstrate his intent to blow the whistle on conduct that he perceived to be unlawful and improper.

4. Joemarie V. Bantigue.  Mr. Bantigue was the Fourth Engineer of the M/T Alcesmar. On January 19, 2006, Mr. Bantigue departed the M/T Overseas Alcesmar upon arrival in the Port of Wilmington, N.C.  Mr. Bantigue asked a security guard on the dock for assistance in making a report to the U.S. Coast Guard.  The guard instead contacted the ship's agent who in turn contacted the Captain.  The Chief Engineer and Second Engineer visited the Fourth Engineer in the guard shack and tried to get him to return to the ship.  He refused.  The Master eventually convinced him to come back to the ship and met with him privately and in the presence of OSG's shore-based superintendent who had come from Greece as had a technical representative for the company servicing the programable logic controller ("PLC") that operates in conjunction

with the Oil Content Monitor.  According to Mr. Bantigue, he told them that he  feared for his

life and that the ship had bypassed the Oily Water Separator on January 14, 2006.  OSG's

Superintendent asked the PLC technical representative if this was possible since the PLC was not

working and he indicated he did not think it was possible.  The Superintendent asked the Fourth

Engineer if he wanted to return home, and he stated that he did.  The Master sent the Fourth

Engineer to a local hotel and made arrangements for him to fly back to the Philippines the next

morning without notifying the Coast Guard or the U.S. Department of Justice.   Having been

frustrated in his efforts to notify the government, Mr. Bantigue contacted the hotel's night desk

clerk, and with his assistance, contacted the Coast Guard.  When he was met by a special agent

early the next morning, Mr. Bantigue was waiting for a taxi to take him to the airport.  He agreed

not to leave as planned, met with prosecutors and agents, testified before the grand jury, and

remained in the United States until August 2006.

On January 19, 2006, the Coast Guard boarded the vessel in response to allegations by

the Fourth Engineer.  During this boarding, the Oil Record Book was presented.  In conducting

the inspection and investigation, certain crew members presented the Coast Guard with a

falsified Oil Record Book and other misleading records and statements.

When he met with the Coast Guard, Mr. Bantigue provided agents with corroborating

evidence of his allegations which he had taken from the ship.  He provided copper blinds (discs)

that he claimed were inserted into flanges to redirect the flow, a jumper switch made by the

Electrician, and a sheet of contemporaneously recorded soundings of tank volumes showing an

internal transfer and drop in the Bilge Holding Tank on January 14, 2006.         The rough

sounding sheet removed from the ship showed a significant reduction in tank volume that

conflicted with the ship's Sounding Log Book and Oil Record Book which show no reduction in the tank volumes.

    5. <u>Forante P. Abenojar</u>.  Mr. Abenojar was the Second Engineer of the *M/T Ania*.  By email sent to OSG on or about October 18, 2005, he alleged that newly installed anti-tricking equipment had been bypassed by the ship's Chief Engineer.  Mr. Abenojar attached two reports dated August 16, 2005 and October 15, 2005, which he stated he had planned to send *via* OSG's electronic open reporting system.  Instead he sent it from an internet café because he was concerned that OSG's system at that time would have allowed the ship's officers to learn who reported their illegal conduct and after an unrelated dispute between the officers and the rest of the crew.  OSG advised the Department of Justice of these allegations on November 1, 2005, and subsequently terminated both the Chief Engineer and the First Engineer based upon Mr. Abenojar's allegations and OSG's own investigation which confirmed their veracity.

    Among other irregularities Mr. Abenojar reported unauthorized discharges of the contents of the Bilge Holding Tank through the Oily Water Separator (OWS) by use of a  fresh water line that prevented the Oil Content Monitor from analyzing a true sample of the discharge effluent.  As set forth in the Joint Factual Statement, OSG's investigation confirmed the alleged tampering.     Mr. Abenojar's was removed from the ship on November 14, 2005, and agreed to stay in the United States for a period during which time he met with agents and prosecutors and expressed his willingness to testify before the grand jury.  He stayed in the United States for more than one month.

    6. <u>Joeffrey Empas Andaya</u>.  Mr. Andaya was an Oiler on the M/T Cabo Hellas.  On or about March 23, 2006, he provided allegations to an OSG shore based supervisor who was on

the ship to investigate an unrelated matter made through the company's open reporting system.

Mr. Andaya contacted the OSG supervisor and alleged that the ship's Chief Engineer, Rodolfo

Esplana Reye, had instructed him to tamper with the Oil Content Monitor during overboard

discharges.  He indicated that this was done by closing a valve on the sample line.  On March 24,

2006, OSG, in turn, advised the Department of Justice of Mr. Andaya's allegations and that OSG

had corroborated them with other crew members.  A falsified Oil Record Book was maintained

on the *M/T Cabo Hellas* and on the ship during its port call in the Central District of California

that same day when the ship was boarded by the Coast Guard assisted by the EPA.  At that time,

Mr. Andaya advised the Coast Guard that he had been tricking the oil content meter upon orders

from the Chief Engineer.

Mr. Andaya's continued to cooperate with agents and prosecutors and testified before the

grand jury.  He remained in the United States until approximately June 19, 2006, at which point

Chief Engineer Rey pleaded guilty in Los Angeles, California, to making a material false

statements and failure to fully maintain an accurate Oil Record Book pursuant to APPS.  *United

States v. Rodolfo Esplana Rey*, No. 06-CR-00315 (C.D. Calif.).

7 - 8.   Ferdinand Torio and Sandro Sobrivinas.  In July 2005, Mr. Torio, the Third

Engineer of the *M/T Pacific Sapphire*, and the ship's Electrician, Mr. Sobrivinas, sent an email

to the OSG's manning agency in the Philippines expressing concern that the Chief Engineer was

illegally tricking the Oil Content Meter on the Oily Water Separator.  OSG conducted interviews

and disclosed them to the United States in August 2005.  As a result of these allegations, the

Coast Guard boarded the ship in Galveston, Texas, conducted a consensual search and

interviewed crew members.  Mr. Torio and Mr. Sobrivinas met with the Coast Guard and with

prosecutors and agents and remained in the United States through November 2005 to assist in the investigation.

Messrs. Torio and Sobrivinas reported that they had been ordered to trick the ship's Oil Content Meter by the Chief Engineer and that the Oily Water Separator was unable to process the oil-contaminated bilge waste under normal operating conditions.  Both were directed by the Chief Engineer to tamper with the Oil Content Monitor settings to allow waste to be discharged that otherwise caused the system to alarm.  They were uncomfortable with recalibrating the Oil Content Meter and they knew it to be improper.  They also believed that the frequent alarms signaled something wrong with the Oily Water Separator.  The two crew members had first attempted to speak with a shore-side superintendent but were denied permission by the Master.  Before reporting the allegations to shore-based managers via the OSG's manning company in the Philippines, the two crew members asked the Chief Engineer to make repairs and he refused.  They also took samples of the effluent to show him because they believed that oil was being discharged overboard.

As a result of Mr. Torio's and Mr. Sobrivinas' allegations, the M/T Pacific Sapphire's Oily Water Separator was opened and an internal nozzle designed to ensure that oily mixtures were filtered was found missing.  The allegations by these two crew members also contributed to the an expanded investigation beyond OSG's initial disclosure that determined that violations on the *M/T Pacific Sapphire* had also occurred during a prior period of time.


9 - 12.  Benedict Barosso, John Altura, Ulysses Amados and James Suria.  Shortly after midnight on September 15, 2005, in Port Neches, Texas, Benedict Barroso, the Third Engineer

of the *M/T Pacific Ruby*, called the Coast Guard and was directed to the National Response

Center, a Coast Guard hotline.  In the telephone call, a portion of which was recorded, Mr.

Barroso alleged that the Chief Engineer had illegally bypassed the ship's oil pollution prevention

equipment.  Barroso stated that he had observed the bypassing on two occasions, September 11,

2005, and during the last week of August 2005.  In September, he observed Chief Engineer Jho

using a screwdriver to disable the Oil Content Monitor.  Barosso also indicated that the Chief

Engineer had ordered oil-contaminated waste pumped into a "Gray Water Tank" normally

reserved for shower and galley waste, which may be discharged overboard without processing.

Mr. Barroso told the Coast Guard that he was calling on behalf of himself and three other crew

members: Second Engineer John Altura, Oiler Ulysses Amados, and Oiler James Suria.  All four

were willing to testify but were concerned that they may be in danger of personal harm if their

senior officers found out that they had made a report to the Coast Guard.

   The Coast Guard conducted two boardings of the ship.  The first was a routine inspection

conducted later on September 15, 2005, during which Coast Guard officials examined the Oil

Record Book and various ship equipment, but found no obvious violations and took great care

not to reveal the existence of the whistleblowers.   The entries in the Oil Record Book were later

found to have falsely and affirmatively indicated the proper use of the Oily Water Separator and

Oil Content Monitor and to have omitted any mention of exceptional discharges made without

the proper use of the oil pollution prevention equipment.

   During the second boarding, performed with the consent of Defendant OSG on

September 18, 2005, in Baytown, Texas, Mr. Altura provided information to the Coast Guard

regarding the location of evidence on the ship that had been used to pump oily waste into the

Gray Water Tank.  He later provided the Coast Guard with a screwdriver taken from the ship like the one used by the Chief Engineer to tamper with the Oil Content Monitor.

As the investigation progressed, Barroso, Altura, Amados, and Suria voluntarily remained in the United States from September 18, 2005, to December of 2005, to be interviewed and to testify before the Grand Jury.  They weathered Hurricane Rita.  They returned to the United States from the Philippines one year later, in November 2006, to make themselves available to testify at trial in the Eastern District of Texas. The information provided by Barroso, Altura, Amados, and Suria also played an important role in the overall disposition of this case because of the strength of the evidence, the availability of willing witnesses, and the implication that violations within OSG's fleet were widespread and ongoing.

## III.    Conclusion

Pursuant to the plea agreement and the entire record in this case, including the information set forth herein and the Joint Factual Statement, the United States respectfully moves this Court to find that an award in this matter would be consistent with the manifest purpose of the statute of encouraging those with information about unlawful conduct to come forward and disclose that information to authorities.  The United States respectfully requests that the Court grant equal

shares of one-half of the criminal fine imposed pursuant to APPS among the twelve

whistleblowers identified herein.

Respectfully submitted,

MATTHEW J. McKEOWN                          MICHAEL J. SULLIVAN
Acting Assistant Attorney General            United States Attorney
Environment & Natural Resources Div.         District of Massachusetts
U.S. Department of Justice


By: /s/ Richard A. Udell                      By: /s/ Jonathan F. Mitchell
RICHARD A. UDELL                             JONATHAN F. MITCHELL
Senior Trial Attorney                         Assistant U.S. Attorney
Environmental Crimes Section                  CMR Luke Reid, U.S.C.G.
U.S. Department of Justice                    Special Assistant U.S. Attorney

<u>Certificate of Service</u>

       I, Jonathan F. Mitchell, hereby certify that on March 15, 2007, I served on counsel of record for OSG a copy of the Government's Amended Motion for Whistleblower Awards via the ECF system.


                     <u>/s/ Jonathan F. Mitchell</u>
                     Jonathan F. Mitchell