# United States District Court
# District of Massachusetts

UNITED STATES OF AMERICA,

     vs.                       CRIMINAL 2006-10408-RCL

OVERSEAS SHIPHOLDING GROUP, INC.,
     Defendant.

## *MEMORANDUM AND ORDER ON MOTION FOR APPROVAL OF ATTORNEY'S FEES (#48)*

COLLINGS, U.S.M.J.

### *I.  INTRODUCTION*

On May 25, 2007, the district court (Lindsay, J.) issued an order in this criminal action granting whistleblower awards pursuant to the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1908(a).  The recipients of the awards were twelve crew members aboard various vessels owned by the defendant, Overseas Shipholding Group, Inc. ("OSG").  In addition, the district court ordered that "any proposed legal fees in excess of $10,000.00 for legal

services performed in connection with the granting of whistleblower awards in this case, must be approved by the Court after notice to the government." (#37, Order Concerning Whistleblower Awards).  In response, Zack Hawthorn ("Hawthorn"), a Texas-based attorney who represented two of the whistleblowers, filed his Motion for Approval of Attorney's Fees (#48).  In his motion, Hawthorn seeks to enforce contingency fee agreements that he and his clients executed in connection with the whistleblower claims.  The government filed a Response to Motion for Approval of Attorney's Fees (#51), in which it argues that the attorney's fees that Hawthorn seeks are excessive–they amount to 33% of the $437,500 award that the district court awarded to each of Hawthorn's clients.   Hawthorn, in turn, filed his Reply to Government's Response to Motion for Approval of Attorney's Fees (#60).

The District Judge referred the Motion for Approval of Attorney's Fees (#48) to the undersigned for determination.  The Court heard oral argument on the motion on November 19, 2007.  At the hearing, the Court directed the parties to file proposed findings of facts.  On December 10, 2007, Hawthorn and the government filed their Proposed Findings of Fact (## 64 and 65, respectively).  On December 20, 2007, the government filed its Objections to Movant's Proposed Findings of Fact (#66) and Hawthorn in turn filed his own

Objections to Government's Proposed Findings of Fact (#67) on December 21, 2007.

## II. THE FACTS

The record and the parties' submissions support the following undisputed facts.[1]

1. In September, 2005, Benedict Barroso ("Barroso") was the Third Engineer aboard the *M/T Pacific Ruby*, (#65 ¶ 1; #13, Government's Amended Motion for Whistleblower Awards at 12-13), a tanker owned and operated by OSG. On September 15, 2005, in Port Neches, Texas, Barroso telephoned the United States Coast Guard to report that he had observed the Chief Engineer of the *Pacific Ruby*, Kun Yun Jho ("Jho"), illegally bypassing the ship's oil pollution prevention equipment. (#65 ¶ 1; #13 at 13) Barroso stated that he was calling on behalf of himself and three other crew members, Second Engineer, John Altura ("Altura"), Oiler Ulysses Amados, and Oiler James Suria. Barroso explained that all were willing to testify but were concerned that they may be in danger of personal harm if their senior officers, including Jho, found out that they had made a report to the Coast Guard. All

---

[1]

The statement of facts here reflects the undisputed facts in the record, and the Court often adopts the parties' statement of facts verbatim, but without quotation marks; others are reworded and/or supplemented.

four are Filipino nationals. (#65 ¶ 1)

2. Based on Barroso's report, the Coast Guard conducted two boardings of the ship, on September 15, 2005 and on September 18, 2005.  During the second boarding, Altura provided information to the Coast Guard about the location of evidence on the ship that supported the whistleblowers' allegations. (#65 ¶ 2)

3. An investigation into the allegations ensued.  OSG provided independent counsel for the four *Pacific Ruby* whistleblowers as well as other crew members from the ship.  (#65 ¶ 3)  After the *Pacific Ruby* whistleblowers expressed concern regarding their representation by OSG-procured counsel, and given their unfamiliarity with the American criminal justice system, the government brought the four witnesses before a magistrate judge in the United States District Court for the Eastern District of Texas (hereinafter, "the Eastern District of Texas").  *Id.*  After inquiring of them *ex parte*, the court appointed each of the four *Pacific Ruby* whistleblowers with separate counsel from the district's Criminal Justice Act ("CJA") panel.  *Id.*  Hawthorn was appointed from the panel on October 7, 2005, to represent Barroso.  (#64 ¶ 1)

4.  Hawthorn and the three other attorneys represented the four witnesses in connection with their appearances before the grand jury and in

interviews with government counsel. (#65 ¶ 4)   The four whistleblowers voluntarily remained in the United States from September 18, 2005 to December, 2005, to be interviewed by the government and to testify before a grand jury.  (#13 at 14)

5.  Based on the witnesses' testimony, on August 16, 2006, a grand jury in the Eastern District of Texas indicted Jho and OSG on charges of conspiracy under 18 U.S.C. § 371, false statements under 18 U.S.C. § 1001 and violations under APPS, 33 U.S.C. § 1908(a).  (#64 ¶ 2; #65 ¶ 4)

6.  On December 4, 2006, United States District Court Judge Thad Heartfield dismissed all of the charged APPS counts against OSG.  (#64 ¶ 3; #65 ¶ 6).  *See also United States v. Kun Yun Jho and Overseas Shipholding Group, Inc.*, 465 F. Supp.2d 618, 622-626 (E.D. Tex. 2006).  The government filed a notice of appeal and moved for the remainder of the case to be stayed pending appeal.[2]  The Eastern District of Texas action case was set for trial on December 11, 2006.  (#64 ¶ 2)

7.  In late November and early December 2006, government counsel and federal agents met with the *Pacific Ruby* whistleblowers as part of trial

---

[2]

The appeal, denoted 06-41749 in the United States Court of Appeals for the  Fifth Circuit, was argued on January 29, 2008; as of the date of this memorandum, no decision has been rendered.

preparation for the trial concerning Jho and OSG in the Eastern District of Texas.  (#65 ¶ 5) Hawthorn represented Barosso at the time of Barosso's witness preparation.  (*Id.*)  It was during this preparation that Hawthorn learned for the first time that his client may be entitled to an award under APPS in the court's discretion. (*Id.*)  Altura was represented by a different CJA attorney during the trial preparation. (*Id.*)

8.  On December 19, 2006, the government announced a plea agreement with OSG in which OSG would plead guilty pursuant to a single plea agreement covering six districts[3] in which it was under investigation, including the Eastern District of Texas.  (#65 ¶ 7)  The plea agreement specified that the parties would jointly recommend that five of the cases should be consolidated in the District of Massachusetts for plea and sentencing and a separate plea and sentencing would be conducted in the Eastern District of Texas.  (*Id.*)  Under the terms of the plea agreement, OSG pleaded guilty to representative APPS counts in every district except the Eastern District of Texas.  (*Id.*)  The plea agreement provided that if the Court of Appeals for the Fifth Circuit reversed the district court's dismissal of the APPS counts, OSG would plead guilty to

---

[3]

These districts include: the Central District of California, the Northern District of California, the District of Maine, the Eastern District of North Carolina, the District of Massachusetts, and the Eastern District of Texas.

three APPS counts but that if it were upheld, OSG would instead enter guilty pleas to three additional Section 1001 counts.  (*Id.*)  In the plea agreement, OSG agreed to pay a total aggregate criminal fine amounting to $27.8 million. The plea agreement further detailed the allocation of fines according to district and counts.  (*See* #28, Plea Agreement, at 3-5, 9-17)  Of the total fine amount, $10.5 million was attributable to APPS violations  in various districts. (#13 at 1)

9.   Hawthorn sent an email to Barroso dated December 20, 2006, in which Hawthorn informed Barroso that there had been "some developments in the case" that he wanted to talk to Barroso about.  (Exh. 2, submitted at 1/19/07 hearing)[4]

10.  On December 22, 2006, Hawthorn contacted Lana Pettus, one of the attorneys representing the government, and informed her that he would be pursuing a whistleblower claim on Barroso's behalf.  (#64 ¶ 7)

11.  On January 3, 2007 (#64 ¶ 8), Hawthorn sent Barroso an email that stated:

> Benedict,

---

[4]

All exhibits referenced hereafter were submitted by Hawthorn at the hearing conducted on November 19, 2007.

I've tried to call you last week but all the circuits to the Phillipines were busy, or so the phone company said. In any event, let me catch you up with the developments in the case. The case against Jho and OSG was dismissed on a legal ruling filed by their attorneys. The Government is appealing that decision. However, OSG had a bunch of other cases pending elsewhere in the United States and they pled guilty to all of those. If the Government wins the appeal on the case in Beaumont, OSG will plead guilty on that one as well. I don't know if Jho will still take his case to trial if the Government wins their appeal. I assume you will still be a necessary witness if that case goes to trial but we can be looking at up to a year from now.

In any event, the last time you and I were together, the U.S. Attorney's office brought up the possibility of a whistleblower lawsuit. I told you we would discuss that at a later date. I have done a little research and think you may be entitled to some compensation for your cooperation with the investigation of OSG's activities. I do not know if you will ultimately get compensated or how much but it is definitely a possibility.

The whistleblower lawsuit is separate than my representation of you on the criminal case. If you are interested in me representing you on the whistleblower case, I will need you to sign the attached form and send it to my office. Basically, what it sets out is that I will represent you on a contingency fee basis. My fee will be contingent on a recovery of compensation. If we recover nothing, you don't owe me anything. However, if we recover any compensation, I get 33% of that amount. I will also get reimbursed for any expenses I incur during the case and some examples of those expenses are set out

> in the Contract.  However, in this case I expect those
> expenses to be minimal.
>
> In order for me to start protecting your interests on the
> whistleblower case, I need to get started soon.  I
> cannot get started until I receive a signed copy of the
> attached Employment Contract.

Exh. 3.

12.  On January 11, 2007, the government and OSG jointly moved to consolidate all pending criminal cases for a Rule 11 plea colloquy, except the pending indicted case in Texas, (#2, Joint Motion to Consolidate Cases as to Overseas Shipholding Group, Inc.), and the district court granted that motion in an electronic order dated January 29, 2007.  The Eastern District of Texas case was never consolidated and brought before Judge Lindsay.  (#64 ¶ 11)

13.  On January 17, 2007, Barroso responded to Hawthorn's email of January 3 as follows:

> regarding to your last e-mail I need to discuss it to the
> other three guys.  I told you I am not alone with thiese
> [sic].  I am in Germany rigth [sic] now and I am going
> to Caracas Venezuela to join/board a ship.  It is the
> Oversseas Neptune aalso [sic] owned by OSG.

Exh. 3.

14.  On February 2, 2007, OSG filed its Unopposed Motion to

Consolidate Rule 11 Plea and Sentencing Hearings (#3) in the underlying criminal case,  which Judge Lindsay denied on February 8, 2007.

15.  On February 7, 2007, the government filed its Response to Defendant's Motion to Consolidate Rule 11 Plea and Sentencing Hearings (#5), in which it noted that "[w]ith regard to the potential applicability of the whistle-blower reward, the government plans to apprise certain defense counsel so that they may have an opportunity to address the Court, if the Court so permits." (#5  at [2]) The government noted that the plea hearing was held in the Eastern District of Texas on January 23, 2007, and that the sentencing in that court was scheduled for March 26, 2007. (#5 at [2])

16.  On February 13, 2007, Judge Lindsay agreed to hold the plea and sentencing hearings on the same date, and scheduled both hearings for March 21, 2007.  Judge Lindsay directed that any sentencing memoranda be filed no later than March 14, 2007.

17.  On March 9, 2007, Richard Udell ("Udell"), the lead prosecutor with the government, contacted Hawthorn to alert him about the upcoming plea/sentencing hearing to be held on March 21, 2007. (#64 ¶ 14; #65 ¶ 9)

18. On March 12, 2007, Hawthorn emailed Udell to say that he was "gearing up for the plea hearing . . . in Boston" (Exh. 4) and asked whether

10

Udell knew of "anyone that had represented a whistleblower and filed a pretty good motion in support of their claim," because Hawthorn thought it "would be helpful for [him] to make [his motion] consistent with prior APPS/MARPOL cases."(*Id.*)  Udell responded that he had seen very few such motions, except those by the government.  (*Id.*)  He attached a copy of a motion by a USAO, and stated that the government was considering filing something similar. Hawthorn responded:

> Due to the complexities of this case from Benedict's end, I would think it might be helpful for me to file something on his behalf.  Of course, I would wait until your sentencing memorandum is out.  I trust you would set forth everything fairly and accurately because your knowledge of the case is substantially greater than mine.  However, I think the Court should be aware of Benedict's personal hardships that only he and I could let the court be aware of.

Exh. 4; *see also* #64 ¶ 15.

19.  Altura contacted Hawthorn by email dated March 13, 2007.  He stated that Barroso had given him Hawthorn's information.  Altura requested that Hawthorn represent him in the whistleblower action on the same contingency terms that Hawthorn had with Barroso.  (#64 ¶ 16; Exh. 5) Hawthorn dated the contract March 13, 2007, but there is not indication when Altura signed the contract.  (*See* Exh. 11)

20.  On March 13, 2007, Hawthorn sent an email to Barroso advising him of the possible conflict of interest in his representing both Barroso and Altura, and requesting both a waiver of conflict and that Barroso agree to the employment contract.  (Exh. 7)

21.  On March 13, 2007, Hawthorn hired local Boston counsel.  (#64 ¶ 18).  Local counsel entered an appearance in the case, and filed a Pro Hac Vice motion for Hawthorn.  Hawthorn paid local counsel $3,577.50.  (#64 ¶ 20)

22.  On March 14, 2007, Barroso sent Hawthorn an email in which Barroso agreed to the terms of the contract and agreed to waive any potential conflict of interest.  (Exh. 8)  Barroso signed the written contract, but that contract is undated.  (*See* Exh. 9)

23.  On March 14, 2007, the government filed its Motion for Whistleblower Awards.  (#9; *see also* #13, Amended Motion for Whistleblower Awards)   The government noted that each crewmember was represented by counsel, and that it would provide each counsel with a copy of the pleading.  (#13 n.1)   In that motion, the government asked the court "to authorize payments of $437,500 to each of the twelve whistleblowers whose assistance led to the successful prosecution of this case." (#13 at 1)  The government noted that

> [o]f the $27.8 million in criminal fines, $10.5 million
> will be attributable to APPS violations.  Therefore,
> under Section 1908(a) there is $5.25 million from
> which the court can award to those persons who
> provided information that resulted in OSG's
> convictions.   While each crew member provided
> specific information leading to specific counts, each
> individual and individual case also contributed to the
> overall settlement.  Because the differences in relative
> contributions of the twelve whistleblowers are not
> extremely significant, the United States proposes that
> the Court apportion the award equally among the
> whistleblowers.

#13 at 1-2.

In its memorandum, the government outlined the contributions of all twelve

whistleblowers, including Barroso and Altura (#13 at 12-14), and noted that

none of the individuals had mentioned or requested a reward, nor had the

government informed the individuals about the possibility of an award during

the investigation, (#13 at 4).

24. On March 14, 2007, Hawthorn advised Barroso by email that the

government had recommended that Barroso be awarded $437,500.  (Exh. 24)

In that email, Hawthorn wrote, in relevant part:

> As I have told you, you may be entitled to part of the
> fine assessed in the Boston case because the law states
> that one who is a witness and whose help leads to an
> Act to Prevent Pollution (APPS) conviction may be
> entitled to a portion of the fine assessed in the case.

> Here, the Government has agreed that you and eleven (11) others are witnesses who are entitled to a portion of the fine assessed in the case.  In fact, they say that each is entitled to 437,500.00.   However, your cooperation has not actually directly resulted in an APPS conviction because the judge in Beaumont dismissed those cases.  Regardless of that fact, the government thinks your cooperation led to the overall success of the cases and thinks you should therefore get a portion of the fine.
>
> I anticipate that other witness, through their lawyers, will attempt to convince the judge that you should not be entitled to the 437,500.00 because the APPS counts in Beaumont were dismissed.  I will be ready to defend you in Boston from such an attack.  In fact, I think you should be entitled to more than ½ of the fine because your cooperation was the catalyst for all the convictions and because your career has suffered significantly as a result of your cooperation. I will also be prepared to make such a presentation to the judge.    However, lawsuits are always unpredictable.   It could be that none of the other witnesses will bring up the fact that your cooperation did not directly result in an APPS conviction. . . .

Exh. 24.

25. On March 16, 2007, OSG filed its Response to Government's Sentencing Memorandum and Amended Motion for Whistleblower Rewards (# 19), in which it made the following argument:

> With respect to the four whistleblowers on the M/T Pacific Ruby (Benedict Barroso, John Altura, Ulysses Amados and James Suria), OSG has concerns over this Court granting a monetary award to these

individuals.  The Pacific Ruby is the only vessel that is not subject to the Plea Agreement before this Court. These individuals are witnesses in a companion case currently pending in the Eastern District of Texas, <u>United States v. Kun Jun Jho and Overseas Shipholding Group, Inc.</u>, Criminal Number 1:06-CR-65 (Judge Thad Heartfield).  Although OSG has pled guilty in the Eastern District of Texas, OSG has not been sentenced in that case, as the Government has taken an interlocutory appeal.  Thus, because these four individuals are involved in a matter that arises solely in the Eastern District of Texas, OSG believes that any awards are more properly administered by that court.

#19 at 13-14.

26. On March 19, 2007, Hawthorn filed a nine-page response to OSG's motion.  (#22, Interested Parties Barroso and Altura Reply to Defendant's Response to Government's Sentencing Memorandum and Amended Motion for Whistleblower Awards),  in which he argued that the district court could properly award whistleblower awards to those aboard the *Pacific Ruby*, and pointed out that "all of the APPS counts that were pending in the Eastern District of Texas were dismissed by the Honorable Judge Thad Heartfield upon their own Motion.  Thus, as it stands right now, there are *no* awards to be administered by that Court."  (#22 at 2)  Hawthorn further argued, *inter alia*, that

> [e]ven if Judge Heartfield's dismissal orders are overturned by the Fifth Circuit Court of Appeals, OSG will plead to three different APPS counts that encompass a total fine amount of $2.4 million. Pursuant to 33 U.S.C § 1908(a), if the four individuals from the *Pacific Ruby* were to make a claim in the Eastern District of Texas (which to this point they have not), the most each individual could receive if it is divided equally among them would be $137,500 less than the other eight whistleblowers were to receive in this matter. This is inconsistent with the Government's assessment that each individual and individual case contributed to the overall settlement, and the differences in the relative contributions of the twelve whistleblowers were not extremely significant.

#22 at 3.

27. On March 19, 2007, the government filed its Reply to OSG's Response to Government's Amended Motion for Whistleblower Awards (#23), in which it argued:

> OSG has suggested only that it might be better if any awards to the four M/T *Pacific Ruby* whistleblowers (Barroso, Altura, Amados, Suria) be considered in the Eastern District of Texas. OSG's response misses the boat. It is unknown at this time whether there will be any APPS convictions in the Eastern District of Texas in this case. OSG is actively contesting the applicability of APPS in that district in an appeal now before the Fifth Circuit. Regardless of the outcome of the appeal, however, OSG will still pay the same total fine. More to the point, the four whistleblowers from the *Pacific Ruby* contributed, like the other whistleblowers, to the overall settlement in

> the case in roughly equal measure, and therefore, they
> are entitled to equal shares of the APPS fine for the
> *entire* case.

#23 at 1-2.

28. The plea/sentencing hearing in the underlying case was conducted

on March 21, 2007.  At the hearing, the government pointed out that the APPS

convictions had been dismissed in the Eastern District of Texas, and that there

might never be APPS convictions there.  (*See* Transcript of Sentencing Hearing

at 82-83)  The government argued that the *Pacific Ruby* four contributed "to

the case as a whole as well as to the specific counts in that district.  But for the

volume of this case, the sum total of 12 ships and the fact that there were

willing and available witnesses, this settlement would not have been as high

as it was."  (*Id.*)

29.  The district court expressed "modest reservation about dealing with

the Texas people," (*id.* at 83), but observed that Hawthorn was there at the

hearing "representing the Texas people," (*id.*). Hawthorn argued that the Court

had jurisdiction by dint of its statutory discretion to fashion an award in favor

of his clients.

30.  From the bench, Judge Lindsay granted the government's motion to

award $437,500 to each of the twelve whistleblowers.  In an Order dated May 25, 2007, Judge Lindsay ordered that the awards be disbursed to the twelve whistleblowers, and further ordered that "any proposed legal fees in excess of $10,000.00 for legal services performed in connection with the granting of whistleblower awards in this case, must be approved by the Court after notice to the government." (#37 at 2)

31.   On June 26, 2007, Hawthorn filed a Notice of Compliance with Court Order Concerning Whistleblower Awards and Authorization to Receive Payment for John Altura and Benedict Barroso (#43) to which he appended two documents entitled "Authorization to Receive Payment" signed by Barroso and Altura on March 16, 2007.  The authorizations "direct[ed] that funds due to me be deposited in Mr. Hawthorn's trust fund account and that he transmit the same to me in accordance with the Employment Contract entered between us." (#43, Attachments 1 & 2)

32.   In an email to Hawthorn dated March 23, 2007, Altura wrote:

> Zack,
>      Me and the other guys have already talked about it.  If the usgov had granted us some money, whether they give it to any of us four, it would still be divided by 4.  I know how important of you defending our rights, and I thank you for that.  Me and Ben have no problem in paying you, and it goes as well with

> Amados and Suria. For now, me and the other guys
> are thinking of some options on how will you and Mr.
> Udell will [sic] dissiminate [sic] the claim. It could be
> sent to a single Philippine Bank account or to each
> account of us four. We'll inform you as soon it is
> settled [sic].

Exh. 19.

33. In an email to Hawthorn dated May 31, 2007, with a subject line

reading "Letter for Judge," Altura wrote:

> Greetings!
> I would like to express my sincerest gratitude to your
> honor for the favorable result of our case.
> This letter is hereby written to request that your honor
> consider and acknowledge the binding agreement that
> I have made with my lawyer granting him 33% of the
> merits of this case. Attached herewith are the papers
> of our agreement.
> I am hoping for your positive response regarding this matter.
> Thank you.
> John Oliver R. Altura

Exh 23.

34. In an email to Hawthorn dated July 1, 2007, Barroso wrote:

> Dear Judge Lindsay,
>      I have been satisfied with the representation of
> my lawyer, Zack Hawthorn and ask that you award his
> attorneys fee consistent with our employment
> contract.
> Thank you.
> Benedict A. Barroso

Exh. 22.

35.  On August 15, 2007, Hawthorn filed his Motion for Approval of Attorney's Fees. (#48)

### III.  ANALYSIS

#### A.  Applicable Law

A court has broad supervisory authority, deriving from its equity powers, to assess the reasonableness of a fee agreement.  *See Quint v. A.E. Staley Mfg. Co.*, 245 F. Supp.2d 162, 170 (D. Me. 2003) (and cases cited), *aff'd*, 84 Fed. Appx. 101 (1st Cir. 2003); *see also Farmington Dowell Products Co. v. Forster Mfg. Co.* ("*Farmington Dowell Products I*"), 421 F.2d 61, 87 (1st Cir. 1969) ("courts generally are not without power to modify excessive fee arrangements"); *In re Zyprexa Products Liab. Litigation*, 424 F. Supp.2d 488, 492 (E.D.N.Y. 2006) ("judiciary has well-established authority to exercise ethical supervision of the bar" and that "authority includes the power to review contingency fee contracts for fairness").

However,  "unlike statutory fees, which normally are delimited to 'reasonable' compensation, fee awards predicated upon fee arrangements privately negotiated between attorney and client are reviewed more deferentially; in the sense that [courts] will exercise [their] supervisory power to reduce a fee award predicated upon a fee agreement only in those

'exceptional circumstances' where the fee assessed by counsel is 'unethically excessive.'" *Quint v. A.E. Staley Mfg. Co.*, 84 Fed. Appx. 101, 102 (1st Cir. 2003) (per curiam) (unpublished) (quoting *Sargeant v. Sharp*, 579 F.2d 645, 648 n.4 (1st Cir. 1978) and citing *Venegas v. Mitchell*, 495 U.S. 82, 87-88 (1990)).   Thus, a court inquires into the propriety of a contingency fee agreement to satisfy itself that a contingent fee arrangement does not yield unethically excessive fees.   The First Circuit has "set a high standard for a showing of reasons for 'the court's decision to declare less than the amount resulting from the fee agreement as the maximum which could ethically be received.'"   *Sargeant*, 579 F.2d at 648 n.4 (quoting *Farmington Dowell Products Co.*, ("*Farmington Dowell Products II*"), 436 F.2d 699, 701 (1st Cir. 1970)). Thus, "'court intervention in fee dispositions is bound to be confined to exceptional circumstances,'" *(id.)* and so "if the Court finds that an agreement provides for an unethically excessive fee, it may sparingly exercise its supervisory powers over the bar to limit the amount the attorney may actually receive." *Id.* at 648 (footnote omitted).

The First Circuit further draws a distinction

> in over all complexity between the court's role in
> awarding a fee under [a fee-shifting statute] and in
> exercising its supervisory power over the bar. The first

21

> requires the court to arrive at a figure it considers reasonable; the second requires it to arrive at a figure which it considers the outer limit of reasonableness. The first determination is made without reference to any prior agreement between the parties; the second must take account of the fact that an agreement, if freely made, is not lightly set aside.

*Farmington Dowell Products I*, 421 F.2d at 90 (footnote omitted); *see also Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.*, 778 F.2d 890, 895 (1st Cir. 1985) ("to require every fee award to pass the lodestar test would condemn these nonhourly arrangements 'as per se unreasonable whenever [the] awards reach large amounts'") (quoting *Dunn v. H.K. Porter Co. Inc.*, 602 F.2d 1105, 1112 (3d Cir. 1979) (footnote omitted)). Accordingly, the factors a court considers in assessing the reasonableness of attorney's fees under a fee-shifting statute (using the lodestar method) are different from those "bearing on a decision as to the maximum ethically permissible fee." *Farmington Dowell Products I*, 421 F.2d at 89. First, the usual assessment of attorney's fees under the lodestar method "contemplates an estimate of reasonableness from the perspective of one looking back over the litigation." *Id.* For purposes of determining whether a fee is unethically excessive, "the fee arrangement should be viewed to some extent according to the circumstances in which it was made." *Id. Cf. also Boston and Maine Corp.,*

22

778 F.2d at 898 (stating that '[t]o deny [a] fee . . . because it exceeds time charges and looks high *in hindsight* would penalize [an attorney] for a job well done"). Second, "the fact that a fee arrangement is contingent upon success is a factor," *Farmington Dowell Products I*, 421 F.2d at 90, in determining whether a contingency fee is unethically excessive, although it would not be relevant in assessing the reasonableness of attorney's fees under the lodestar method: "Obviously, the fact that the attorney is willing to take an all-or-nothing arrangement might justify a fee which is higher than the going hourly rate in the community." *Farmington Dowell Products I*, 421 F.2d at 90.

In addition to these two factors, the First Circuit has stated that a court may also consider "post-agreement factors such as complexity of problems, quality of work, and results obtained." *Farmington Dowell Products II*, 436 F.2d at 701.[5]   The inquiry is thus "directed at what amount it is ethical to receive, not at what share it is ethical to agree upon." *Id.* Finally, "that a

---

[5]

Likewise, the Third Circuit has stated that, in assessing the reasonableness of a contingent attorney's fee contract, a court "must consider a number of critical factors, including the manner into which the contract was entered, the status and sophistication of the plaintiffs, whether the source of the fee payment is a settlement fund or a tax against the defendants, the size of the proposed award and whether the fee allowed is sufficient to encourage capable counsel to undertake such litigation in the future." *Dunn v. H.K. Porter Co., Inc.*, 602 F.2d 1105, 1110 (3rd Cir. 1979); *see also McKenzie Construction, Inc. v. Maynard*, 758 F.2d 97, 99-102 (3rd Cir. 1985) (noting that circumstances surrounding both negotiation and performance should be examined, but that it would be an "unusual circumstance that a court refuses to enforce a contractual contingent attorney's fee arrangement because of events arising after the contract's negotiation").

client, as here, remains willing to abide by his fee contract is relevant but not controlling, for the object of the court's concern is not only a particular party but the conformance of the legal profession to its own high standards of fairness." *Farmington Dowell Products I*, 421 F.2d at 90 n.62; *see also In re Zyprexa Products Liab. Litigation*, 424 F. Supp.2d at 492 ("A federal court may exercise its supervisory power to ensure that fees are in conformance with codes of ethics and professional responsibility even when a party has not challenged the validity of the fee contract.").

B.  Applying the Factors

1.  *Does APPS Preclude the Award?*

Under APPS, a district court has discretion to award "an amount equal to not more than ½ of [criminal fines]" to "the person giving information leading to conviction" under the statute.  33 U.S.C. § 1908(a).  The Court first considers the government's contention advanced in oral argument that a fee agreement such as the one at issue here undercuts the purpose of the APPS' whistleblower provision, which is to remunerate those willing to risk their jobs by reporting violations of APPS.  Nothing on the face of the APPS statute itself precludes a person potentially entitled to a whistleblower award from contracting to promise an attorney a percentage of a whistleblower award.

24

Case law considering contingency fee agreements in the context of other statutory schemes seems to point in the other direction. *Cf. Venegas v. Mitchell*, 495 U.S. 82, 86-87 (1990) (noting that nothing in civil rights statute, 42 U.S.C. § 1988, or its history "regulate[s] what plaintiffs may or may not promise to pay their attorneys if they lose or if they win," and rejecting conclusion that section 1988 "requires the District Court to invalidate a contingent-fee agreement arrived at privately between attorney and client"); *Farmington Dowel Products I*, 421 F.2d at 88 (section 4 of Clayton Act does not preclude plaintiff from passing on his recovery to his attorney); *Boston and Maine Corp.,* 778 F.2d at 896 ("The contingency aspect did not make the fee per se unreasonable in a bankruptcy reorganization."). Indeed, it may well be that enforcing such contracts serves the salutary purpose of ensuring that whistleblowers awards under the statute are enforced by providing a mechanism whereby whistleblowers are able to obtain competent advocacy. *Cf. Farmington Dowel Products I*, 421 F.2d at 87 n.59 (noting that inquiry into contingent fee agreement in every antitrust suit might impair ability of litigants to obtain effective counsel); *Boston and Maine Corp.,* 778 F.2d at 896 (noting that cutting contingency fee arrangement in bankruptcy reorganization context may limit trustees' ability to "recruit capable counsel").

25

On the other hand, APPS is a criminal statute.  Enforcement of the statute is thus left to the government.  Although Barroso and Altura were entitled to argue that their contributions led to a conviction, the question here is to what extent Hawthorn's legal efforts could have affected the award that the two would ultimately receive.  In other words, the criminal nature of the statute here may diminish any argument that an attorney acting on behalf of a potential whistleblower could recover an award through his or her legal efforts absent the government's prosecution and recommendation to a court.  The Court takes up this point in more detail below.

### 2. Was the Contingency Fee Agreement Reasonable When Made?

In the Court's view, several facts are salient when addressing the reasonableness of the contingency agreement when it was executed.  OSG entered into a global plea agreement with the government on December 19, 2006.  Shortly thereafter, Hawthorn contacted Barroso about entering into a contingency fee agreement to pursue a whistleblower award under the statute.  The plea agreement specified that OSG would be responsible for a total aggregate criminal fine of $27.5 million, of which $10.5 million, as it turns out, was attributable to APPS counts in various districts.  Significantly, however, the APPS counts had been dismissed in the Eastern District of Texas.  Thus, at the

26

time that Hawthorn suggested the contingency fee arrangement, Hawthorn was probably accurate in advising Barroso that he was uncertain whether Barroso would "ultimately get compensated or how much but it [was] definitely a possibility." Statement of Facts, ¶ 11.  Perhaps Hawthorn should have apprised Barroso of the possible magnitude of the award at this juncture, but any estimation would have been pure speculation on Hawthorn's part, given the circumstances.

A few facts give the Court pause, however.  First, it appears that Barroso was at sea when Hawthorn sent the contingency fee contract for Barroso to sign.  By Hawthorn's own submissions, communication with Barroso was difficult.  On January 17, 2007, Barroso responded to Hawthorn's email of January 3 as follows:

> regarding to your last e-mail I need to discuss it to the other three guys.  I told you I am not alone with thiese [sic].  I am in Germany rigth [sic] now and I am going to Caracas Venezuela to join/board a ship.  It is the Oversseas Neptune aalso [sic] owned by OSG,

Exh. 3.

This circumstance suggests that Barroso was not fully at liberty to negotiate the terms of the contract, or to shop around for other representation.  *See Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1110 (7th Cir. 1982) (while "[i]n ordinary

circumstances, trials courts may have no reason to inquire into the terms of an attorney-client contract," counsel fees have been subjected to court oversight "when the client is unable fully to protect his own interests," as in the case of seamen) (citing *Schlesinger v. Teitelbaum*, 475 F.2d 137, 140 (3rd Cir.) (noting that seamen are wards of admiralty, and federal courts their guardian, and holding that district court had power to establish contingency fee schedule in personal injury actions on seamen's behalf), *cert. denied*, 414 U.S. 1111 (1973)).  The government also argues that Barroso and Altura, who are both Filipino, should not be deemed to have entered the contract voluntarily and willingly, because both lacked the language skills and knowledge of the American legal system to be able to negotiate the contract.

Ultimately, Barroso appears to have agreed to the contingency arrangement on March 14, 2007.  In the meantime, Altura contacted Hawthorn about Hawthorn's representing him in the whistleblower proceedings on the same terms as Barroso, and Altura signed the employment contract on March 13, 3007.  These details are significant because both Barroso and Altura executed the agreements on the eve of the sentencing hearing in Boston, just before the government announced its plan to recommend that Barroso and Altura be compensated in the same amount as the other whistleblowers.  The

Court cannot say from the record whether Barroso and Altura simply wanted to ensure that they had counsel present to advocate for them at the hearing, or whether, as the government suggests, that Barroso and Altura were unaware "of the degree to which the matter was not contingent upon the aid of counsel," (#51 at 7) and failed to appreciate "having signed their contingency fee agreement just days before the sentencing, that there were limited opportunities for counsel to provide substantial assistance in aid of a possible whistleblower award". (#51 at 8)

In other words, when Barroso and Altura executed the contract roughly one week before the sentencing hearing, Hawthorn must have known that he did not face depositions, discovery, or a protracted trial.  Rather, Hawthorn should have been aware that his efforts would be limited to filing a sentencing memorandum, and presenting an argument at sentencing.

### 3.  Was the Agreement "Contingent" in Nature?

Additionally, in assessing whether a contingent fee award is excessive the Court should consider whether, indeed, Hawthorn undertook the representation in the face of meaningful risk.  *Boston and Maine Corp.*, 778 F.2d at 897 (asking whether "[t]he justification for a pure contingency fee–that the attorney assume the risk of receiving no compensation for his efforts," was

present in the case).  The facts do indeed support Hawthorn's contention that his clients' chances of recovery were by no means a certainty. Although the government first alerted Hawthorn to the possibility of whistleblower awards for the crew members aboard the *Pacific Ruby* at some point in late November or early December, 2006, the government's position vis-à-vis their entitlement to an award was not public until March 14, 2007, when the government submitted its Motion for Whistleblower Awards.  On March 9, 2007, the government told Hawthorn, in substance, that it had not determined whether it would recommend a reward for the *Pacific Ruby* crewmembers.

In addition, Barroso and Altura faced several significant obstacles at the outset in pursuing a whistleblower award.  As noted, the APPS counts had been dismissed at the time that Hawthorn entered into the contingency fee agreement with Barroso.  Furthermore, the plea agreement contemplated that all the pending criminal cases against OSG, except the case in the Eastern District of Texas, would be consolidated in the District of Massachusetts for plea and sentencing.  So although Hawthorn had the benefit of the fully negotiated plea agreement before him, Hawthorn was faced with the very real argument that none of the criminal fines would be attributable to his clients' efforts.  Given the dismissal of the APPS counts in Texas, it was by no means

a foregone conclusion that his clients would be entitled to a whistleblower award. Thus, with this sequence of events, i.e., the dismissal of the APPS counts, and the consolidation in the Massachusetts district court of all the pending criminal cases against OSG except for the Texas case, Hawthorn was probably correct to worry that the District Court in Massachusetts might question its authority to award Barroso and Altura a whistleblower award. Finally, Hawthorn expressed concern that the other eight whistleblowers might object to the *Pacific Ruby* sharing in the award, given that Barroso's and Altura's portion would reduce the share of the other whistleblower awards. Thus, the Court cannot conclude that this is a case of overreaching, where Hawthorn induced Barroso and Altura to enter into contracts after it became clear that recovery was a certainty.

But the Court frames the question somewhat differently. Given that APPS is a criminal statute, and that the whistleblower award would be determined as part of the sentencing hearing, Hawthorn should have known that there would be no whistleblower "lawsuit" per se to pursue here, and Hawthorn was never at risk of expending a substantial amount of time or resources conducting discovery, deposing witnesses, or conducting a trial, as might be expected in the ordinary tort case. Rather, much of the contingency

here hinged on the recommendation that the government would make at sentencing. *Cf. United States v. Anaconda Wire and Cable Co.*, 342 F. Supp. 1116, 1123 (S.D.N.Y. 1972) (noting that under Refuse Act, "[e]ven when the propriety of a specific reward is not contested, the United States Attorney, as the representative of the Government from whom the reward would indirectly come, should substantiate the claimant's allegations in so far as the proof was in the Government's possession."). Thus, the contributions that Hawthorn could have made here to achieve success were necessarily finite: he could (and did) oppose OSG's argument that the jurisdictional limitation militated in favor of the district court in Massachusetts deferring to the district court in Texas–but the government also made that argument. He could (and did) argue at sentencing that his clients were entitled to share equally in the award, but the government also made that argument.

Even assuming that the government had taken the contrary position at sentencing, *viz.*, that Barroso and Altura were not entitled to an award, Hawthorn's efforts would still have been limited to presenting an argument at sentencing on behalf of his clients. The record establishes that there is virtually

little else he could have done to vindicate their rights.[6]  So while it is true, as

Hawthorn points out, that several facts could have led to no recovery at all for

his clients, i.e., there was no legal authority suggesting that recovery was likely

for his clients, and that the statute itself authorizes an award "up to ½" the

amount of the criminal fines, it seems clear to the Court that Hawthorn

probably overstates the impact that his own legal efforts could realistically have

had on the result here.  *Cf. In re Sulzer Hip Prosthesis and Knee Prosthesis

Liability Litigation*, 290 F. Supp.2d 840, 851 (N.D. Ohio 2003) ("'lawyers can

use their superior knowledge of the risk and costs involved to set their

percentage fee at a high figure that bears little relationship to the time and

money that lawyers must put at risk'") (quoting Wolfram, *Modern Legal Ethics*,

§ 9.4.1 at 529 (1986) (and other authorities cited).[7]

  *4.  What Other Factors are Relevant?*

---

[6]

   In theory, perhaps, Hawthorn might have called his clients to testify on their own behalf.  *See, e.g., Miller v. United States*, 455 F.2d 833, 834 (4th Cir. 1971) (due process requires that claimants to whistleblower award under Refuse Act should be "given an opportunity to litigate their claim," *i.e.*, to confront adverse witnesses, adduce evidence, etc.).  Despite Hawthorn's argument to the contrary (*see* #60 at 6), nothing in the record suggests that Hawthorn had plans to do so, even at the point, March 9, when he was still uncertain what the government's recommendation would be.

[7]

   In other words, "'[n]ot every contingent fee is justifiable by appeal to the lawyer's assumption of the risk of nonrecovery.  There are situations in which the lawyer knows in advance that the contingency factor is negligible, or in which the lawyer's effort bear[s] virtually no relationship to the size of the recovery, resulting in pure windfall.'" *In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation*, 290 F. Supp.2d 840, 851 (N.D. Ohio 2003) (quoting 1 Hazard & Hodes, *The Law of Lawyering* § 8.6 at 8.16 (3rd ed. 2000)).

The First Circuit also instructs that other post-agreement factors may be relevant in determining whether a fee amount is excessive.  The court may, for example,  consider the complexity of the problems, the quality of the work, and the size of the award.  *See Farmington Dowel Products II,* 436 F.2d at 701. Thus, the First Circuit has emphasized that even if a fee arrangement is "reasonable when made" it is not thereby "insulated from all attack." *Farmington Dowel Products I*, 421 F.2d at 89.

The government contends that the size of the award is out of proportion to the work that Hawthorn performed.  It is true that Hawthorn was involved in pursuing the whistleblower award for Barroso for, at most, a few short months, primarily apprising his client through emails of developments, and advising the government of his intention to pursue the award.  He was involved in the case on Altura's behalf for about a week, prior to the disposition hearing. Barroso and Altura executed the agreements on about March 13 or 14, and the bulk of Hawthorn's work in this case occurred in the two weeks preceding the sentencing hearing on March 21, 2007.[8]   According to the government,

---

[8]

Hawthorn suggests in his reply brief (#60) that he exchanged over 250 emails with his clients, dedicated three weeks of his practice to prepare for the hearing, found and prepared local counsel, expended a substantial amount of time in responding to briefs and letters, reset five jury trials in Texas, conducted many phone calls with attorneys of other whistleblowers, OSG and the government, and spent hours arranging for his clients to receive their money in the Phillipines.  (#60 at 5-6) First, the Court cannot establish most of this

Hawthorn's efforts were minimal: Hawthorn filed a response to OSG's objections to the *Pacific Ruby* award being administered in Massachusetts, and he appeared at the sentencing hearing on behalf of Barroso and Altura. In addition, Hawthorn had the benefit of the government's own advocacy on behalf of the whistleblowers. Finally, the government points out that none of the other attorneys representing whistleblowers have sought more than $10,000 in attorney's fees, and that Hawthorn is the only attorney who seeks to enforce a contingency fee agreement.

Hawthorn responds that no other attorney had the jurisdictional issue or the APPS dismissals with which to contend. His clients, he points out, have urged the Court by letter to enforce the contingency fee contract. Furthermore, he points out that recovery of the whistleblower award was never certain, and that the fees appear excessive only in hindsight. Finally, Hawthorn states that he did not introduce evidence or call witnesses because his clients were satisfied with the government's recommendation. (#60 at 6)

Several facts are pertinent here, in the Court's view. First, the

information from the record. Also, the Court finds it implausible that Hawthorn, at least as concerns Altura who executed the contract just before the sentencing, could have communicated to such an extent with his clients, at least in the one week between their executing the agreements and the sentencing hearing. Finally, even if this description of his efforts is accurate, the Court questions the extent to which Hawthorn's efforts might have realistically affected the outcome.

35

"acquiescence or approval of the client is relevant but not controlling."
*Farmington Dowel Products II,* 436 F.2d at 701.   Further, it is difficult to
estimate the extent to which Hawthorn's presence at the sentencing hearing
might have influenced the district court's decision to make an award to the four
*Pacific Ruby* crew members.   Under the government's characterization, the
district court's decision to fashion an award for those crew members depended
in large part on the government's recommendation.   The government suggests
in this regard that Barroso and Altura never fully knew "the degree to which the
matter was not contingent upon the aid of counsel," (#51 at 7), and that they
never understood that "there were limited opportunities for counsel to provide
substantial assistance in aid of a possible whistleblower award, (#51 at 8).   At
a minimum, the Court considers it relevant that much of the success in this case
depended on the government's position favoring Hawthorn's clients at
sentencing, and the extent to which that position inured to Hawthorn's benefit.
*Cf. In re Zyprexa Products Liab. Litigation*, 424 F. Supp.2d at 493  (noting that
law firms benefitted from economies of scale where related federal cases were
consolidated, suggesting a need to reconsider the fee agreements that may have
been fair when negotiated); *Dunn v. H.K. Porter Co. Inc.*, 602 F.2d 1105, 1113
n.12 (3rd Cir. 1979)   (noting problem encountered in contingency fee

arrangement where increase in number of class action claimants increases total recovery and correspondingly escalates attorney's fees without "proportionate increase in the effort and expense of litigation").  In addition, advocacy in this case required no special area of legal expertise.  Indeed, the record supports that Hawthorn relied on the government's expertise in this area on at least one occasion, *see* Facts, ¶ 18, and that Hawthorn noted that the government's "knowledge of the case [was] substantially greater than [his]," *id.*

## III. CONCLUSION

On the factual record discussed, *supra*, the Court finds that "exceptional circumstances" exist which warrant court intervention to limit the amount of the fee set by the contingent fee agreement and that a fee comprising 33% of each of the awards ($144,375 each; $288.750 in total) is unethically excessive. The Court sets the fee amount at a total of $50,000, which the Court finds to be the "outer limit of reasonableness." *Farmington Dowell Products I,* 421 F.2d at 90.  To be clear, the Court is applying the more "deferential" standard applicable to contingent fee agreements rather than the "reasonable compensation" standard applicable to determining fee awards pursuant to fee-shifting statutes.  *Quint v. A.E. Staley Mfg. Co.,* 84 Fed. Appx. at 102.  In all candor, the amount approved would be lower were the Court to apply the

37

"reasonable compensation" standard in this case.

## IV.  ORDER

Accordingly, it is ORDERED that the Motion for Approval of Attorney's Fees (#48) be, and the same hereby is, ALLOWED in part and otherwise DENIED as follows:  The Court APPROVES attorney's fees in this matter in the amount of $50,000 ($25,000 for each of the two clients); the Court DISAPPROVES any claimed attorney's fees in excess of $50,000.

## V.  STAY OF ORDER

At the hearing on the motion, the Assistant U.S. Attorney argued that Hawthorn's status as a court-appointed attorney for Barroso might entitle Hawthorn to collect his fees under the Criminal Justice Act ("CJA") Plan for the United States District Court for the Eastern District of Texas (" CJA Plan"). (*See* #51 at 7)   In addition, the government suggested at oral argument that the CJA Plan itself prohibited Hawthorn from entering into the contingency fee agreement here because Hawthorn was obliged under the Plan "to continue the representation until the matter, including appeals or review by certiorari, is closed; ... or until the appointment is terminated by court order." (Government Exh. 1, Submitted at 11/19/07 Hearing at 5)   Specifically, the CJA Plan provides that "[a]ppointed counsel may not require, request, or accept any

payment or promise for payment or any other valuable consideration for representation under the appointment, unless such payment is approved by order of the court." *Id.*

Hawthorn countered the government's argument by asserting that the scope of his CJA appointment was limited to representing Barroso in grand jury proceedings, that his representation of Barroso terminated when the APPS counts were dismissed, and that the CJA Plan does not entitle him to recover any fees in connection with the whistleblower award.  Even so, if Hawthorn was still acting as CJA counsel when Barroso entered into the employment contract, then the Court has some concern that Hawthorn might have overstepped the provisions of the CJA Plan.

This Court is loath to interpret another Court's CJA Plan; that task is best left to a judge of the United States District Court for the Eastern District of Texas.  And, in present circumstances,  a judge of that Court should be given the opportunity to review the matter and to decide whether Hawthorn was still obligated "under the appointment" at the time the fee agreement was executed.

Accordingly, it is ORDERED that the Order entered herein be, and the same hereby is, STAYED for a period of sixty (60) calendar days to enable a judge of the United States District Court for the Eastern District of Texas to

determine whether for Hawthorn to receive the fee for representing Barroso

which the Court has approved herein would be in violation of that Court's  CJA

Plan and/or take whatever other action he or she deems appropriate in the

circumstances.

/s/ Robert B. Collings

ROBERT B. COLLINGS
United States Magistrate Judge

April 22, 2008.