UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 06-10408-RGS

UNITED STATES OF AMERICA

v.

OVERSEAS SHIPHOLDING GROUP, INC.

MEMORANDUM AND ORDER ON APPEAL OF THE
ORDER OF THE MAGISTRATE JUDGE
AWARDING ATTORNEY'S FEES

December 1, 2009

STEARNS, D.J.

This case involves an effort by Zack Hawthorn, a Beaumont, Texas lawyer, to

convert a court appointment in the Eastern District of Texas into a substantial award of

attorney's fees in the District of Massachusetts. The travel of the case to Massachusetts

will be explained. Hawthorn's fee request was rejected by Magistrate Judge Collings who

deemed it to be "unethically excessive." Hawthorn's attempt to appeal Magistrate Judge

Collings' finding directly to the First Circuit Court of Appeals was dismissed as

improvidently taken. In remanding the case to this court,[1] the Court of Appeals stated its

agreement

> with the government's argument that the Magistrate's order cannot be
> appealed directly to this Court. Except where litigants have consented to the
> jurisdiction of the Magistrate Judge, Magistrate Judges' decisions are not
> appealable to this court. See United States v. Ecker, 923 F.2d 7 (1st Cir.
> 1991) (per curiam). There was no such consent here. Consequently, the
> appeal must be dismissed. We also note, however, that Hawthorn failed to

---

[1]The case was originally assigned to the late Judge Reginald C. Lindsay. It was
redrawn to this session after his untimely death.

object to the Magistrate Judge's report within ten days.  We express no view on whether there is any action that Hawthorn could take in the district court to remedy that problem now.  See, e.g., Kruger v. Apfel, 214 F.3d 784 (7th Cir. 2000) (per curiam) (ten-day period for filing objections to a magistrate's recommendation is not jurisdictional and therefore a district court is not barred from the consideration of late objections).  In our view, that is a matter for the district court to address in the first instance.

As indicated by the Court of Appeals' citation to Kruger, the ten-day filing rule for objections to a Magistrate Judge's Report and Recommendation (Fed. R. Civ. P. 72(b)(2)), is not considered by most courts to be jurisdictional.  See Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d  § 3070.1, p. 366 (2d ed. 1997 & Supp. 2009).  This is settled law in (at a minimum) the Second, Third, Sixth, and Tenth Circuits, in addition to the Seventh Circuit.  See Spence v. Superintendent, Great Meadow Corr. Facility, 219 F.3d 162, 174 (2d Cir. 2000); United States v. Polishan, 336 F.3d 234, 239-240 (3d Cir. 2003); Souter v. Jones, 395 F.3d 577, 585 (6th Cir. 2005); Allen v. Sybase, 468 F.3d 642, 658 (10th Cir. 2006).  See also Thomas v. Arn, 474 U.S. 140, 155 (1985).  At least one First Circuit case also appears to have anticipated the settled rule.  See Lyons v. Powell, 838 F.2d 28, 29 n.1 (1st Cir. 1988).

In agreeing to entertain late-filed objections, appellate and district courts have variously cited the interests of justice, excusable neglect, the avoidance of grave injustice, and the lack of egregious delay.  Here, there is at least an argument for a finding of excusable neglect.  Hawthorn filed a timely, if errant, notice of appeal of Magistrate Judge Collings' decision, albeit in the wrong court.[2]  Although the argument is something of a sop

---

[2]Hawthorn also claims that the failure of the Magistrate Judge to set out a ten-day warning notice in his Memorandum and Order as required by the Local Magistrate Judges' Rule 3(b), excused him from the filing of timely objections.  The government, however, is

given Hawthorn's status as an attorney, the issue of when an attorney's contingent fee agreement crosses the boundary of ethical conduct is too important to be decided on grounds of procedural default.

The standard of review for objections to a Magistrate Judge's findings is set out in the Federal Magistrate Act (28 U.S.C. § 636(b)(1)): "A judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."

<u>SUMMARY OF THE FACTS</u>

The factual background is set out thoroughly in Magistrate Judge Collings' Report and for the most part is not in dispute.  Consequently, I will summarize the essential facts laid out in the Report, supplemented where relevant with additional facts that have support in the record.

In September of 2005, Benedict Barroso, an engineer on the *Pacific Ruby,* a tanker owned and operated by Overseas Shipholding Group, Inc. (OSG), a Philippine carrier, contacted the Coast Guard to report the illegal dumping of oil by the ship's Chief Engineer, Kun Yun Jho.  Coast Guard boardings of the *Pacific Ruby* led to the confirmation of Barroso's report.  Three other crewmen, among them John Altura, came forward as corroborating witnesses.  All of the crewmen witnesses are Philippine nationals.  A grand jury investigation ensued in the Eastern District of Texas.

On October 7, 2005, Hawthorn, a Criminal Justice Act (CJA) panel attorney, was

---

correct that Rule 3(b) has a conclusive effect only in cases involving pro se litigants. <u>Cf</u>. <u>United States v. Akinola</u>, 985 F.2d 1105, 1108 (1st Cir. 1993).

appointed to represent Barroso after he expressed reservation about being represented by an attorney hired by OSG.  The other three witnesses were also assigned CJA counsel. William Harris was appointed to represent Altura.

On August 16, 2006, a grand jury indicted OSG and Kun Yun Jho of multiple violations of the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. § 1908(a), and other criminal offenses.  Hawthorn represented Barroso in appearances before the grand jury and during preparatory interviews with government counsel.  On December 4, 2006, the APPS counts against OSG were dismissed by Judge Thad Heartfield of the Eastern District of Texas for reasons that are not relevant to this opinion.[3]  The government appealed the dismissal to the Fifth Circuit Court of Appeals.  Prosecution of the remaining counts in the Eastern District of Texas was stayed pending the outcome of the appeal.

In the meantime, the APPS case against OSG had expanded to include twelve whistleblowing witnesses and a dozen OSG ships involved in oil dumping incidents in six judicial districts, among them the District of Massachusetts.  On December 19, 2006, the government announced a global plea agreement with OSG.  Under the terms of the agreement, the cases in five districts were consolidated for a plea and disposition in the District of Massachusetts.  The case in the Eastern District of Texas was carved out of the disposition pending the outcome of the appeal to the Fifth Circuit.  OSG agreed to pay a criminal fine of $27.8 million, $10.5 million of which was allocated to satisfy its liability for the APPS violations.

---

[3]Judge Heartfield's dismissal of the APPS counts was reversed by the Fifth Circuit Court of Appeals after the events underlying the present dispute had transpired.  See United States v. Kun Yun Jho, 534 F.3d 398 (5th Cir. 2008).

Three days after the agreement was disclosed, Hawthorn notified Lana Pettus, a government prosecutor, that he intended to pursue a whistleblower claim on Barroso's behalf.  On January 3, 2007, Hawthorn sent Barroso an email explaining that

> the whistleblower lawsuit is separate than my representation of you on the criminal case.  If you are interested in me representing you on the whistleblower case, I will need you to sign the attached form and send it to my office.  Basically, what it sets out is that I will represent you on a contingency fee basis.   My fee will be contingent on a recovery of compensation.  If we recover nothing, you don't owe me anything.  However, if we recover any compensation, I get 33% of that amount.  I will also get reimbursed for any expenses I incur during the case and some examples of those expenses are set out in the Contract.  However, in this case I expect those expenses to be minimal.

> In order for me to start protecting your interests on the whistleblower case, I need to get started soon.  I cannot get started until I receive a signed copy of the attached Employment Contract.

On January 17, 2007, Barroso replied in a noncommital email stating that he had to discuss the issue with the other three whistleblower witnesses on board his ship.  Barroso did not agree to the contingency fee contract until March 14, 2007.[4]

On February 7, 2007, the government filed notice with Judge Lindsay that it intended (with his permission) to invite certain of the counsel who had represented the whistleblowing witnesses to address the court on the subject of a whistleblower award.  On February 13, 2007, Judge Lindsay scheduled a consolidated plea and sentencing hearing

---

[4]John Altura emailed Hawthorn on March 13, 2007, stating that he was having difficulty reaching his court-appointed attorney (Harris), and had spoken with Barroso. Altura asked Hawthorn if he would represent him in the whistleblowing proceeding. Hawthorn immediately emailed a contingency fee contract to Altura, who agreed to it that same day.  Also on March 13, 2007, Hawthorn emailed Barroso seeking a waiver of any conflict of interest that might arise out of his dual representation of Barroso and Altura.  On March 14, 2007, Barroso emailed Hawthorn agreeing to the contingency fee contract and the waiver.

5

in Boston for March 21, 2007.  On March 9, 2007, Richard Udell, the lead prosecutor, notified Hawthorn of the hearing.  Three days later, Hawthorn emailed Udell asking if he could provide an example of "a good motion" in support of a whistleblower claim.  Udell told Hawthorn that he had only seen such motions filed by the government.  He provided Hawthorn with a copy of one such motion filed by an Assistant U.S. Attorney in a prior case and indicated that the government would be filing something similar with Judge Lindsay.

On March 14, 2007, the government motioned Judge Lindsay "to authorize payments of $437,500 to each of the twelve whistleblowers [including Barroso and Altura] whose assistance led to the successful prosecution of this case."[5]  The government's memorandum discussed the contributions of Barroso and Altura and the other whistleblowing crewmen, making specific note of the fact that none of them had been promised (or had sought) an award.  On March 16, 2007, OSG filed a response to the government's motion, noting that the *Pacific Ruby* case had not yet proceeded to disposition and suggesting that any whistleblower awards involving Barroso and Altura might be "more properly administered" in the Eastern District of Texas.

On March 19, 2007, Hawthorn filed a nine-page response to OSG's memorandum, arguing that because of the dismissal of the APPS counts in the Eastern District of Texas "there are no awards to be administered by that Court," and that in light of the government's assessment that each of the twelve whistleblowers had made a substantial

---

[5]Hawthorn emailed Barroso that same day advising him of the government's recommendation, but also warning that "other witnesses, through their lawyers, will attempt to convince the judge that you should not be entitled to the [$]437,500.00 because the APPS counts in Beaumont were dismissed.  I will be ready to defend you in Boston from such an attack."

contribution to the overall settlement, it would be unfair to deprive the Texas whistleblowers of a proportionate share of the contemplated award. The government also responded to OSG the same day, making the same arguments.

At the March 21, 2007 plea and sentencing hearing, the government and Hawthorn reiterated their arguments. Ruling from the bench, Judge Lindsay granted the government's motion and, despite expressing a "modest reservation" about intervening in the Texas case, awarded $437,500 to each of the twelve whistleblowers, including Barroso and Altura. In a written Order dated May 25, 2007, confirming his earlier oral grant of the awards, Judge Lindsay stipulated that "any proposed legal fees in excess of $10,000.00 for legal services performed in connection with the granting of whistleblower awards in this case, must be approved by the Court after notice to the government."

On June 26, 2007, Hawthorn submitted a "Notice of Compliance" with two appended "Authorization[s] to Receive Payment" purportedly signed by Barroso and Altura on March 16, 2007, directing that "funds due to me be deposited in Mr. Hawthorn's trust fund account and that he transmit the same to me in accordance with the Employment Contract entered between us."[6] On August 15, 2007, Hawthorn filed a "Motion for Approval of Attorney's Fees" requesting a contingency fee award of 33 percent.[7] None of the other ten attorneys

---

[6]On May 31, 2007, and July 1, 2007, respectively, Altura and Barroso emailed Judge Lindsay asking that (in Altura's case) he "acknowledge the binding agreement that I have made with my lawyer granting him 33% of the merits of this case," and (in Barroso's case) that "you award his attorney['|s fee consistent with our employment contract."

[7]Hawthorn did not seek his out-of-pocket expenses. These appear to consist of $3,577.50 paid to local counsel in Boston and the expenses associated with traveling to the March 21, 2007 hearing in Boston.

then representing the whistleblower witnesses applied for an award of fees in excess of $10,000.  On September 20, 2007, Judge Lindsay referred the matter of Hawthorn's fee request to Magistrate Judge Collings.

After an evidentiary hearing and various submissions by the parties, Magistrate Judge Collings issued his Memorandum and Order on April 22, 2008.  See United States v. Overseas Shipholding Group, Inc., 547 F. Supp. 2d 75 (D. Mass. 2008).  In his ultimate conclusion, he ruled as follows.

> On the factual record discussed . . . , the Court finds that "exceptional circumstances" exist which warrant court intervention to limit the amount of the fee set by the contingent fee agreement and that a fee comprising 33% of each of the awards ($144,375 each; $288,750 in total) is unethically excessive.  The Court sets the fee amount at a total of $50,000, which the Court finds to be the "outer limit of reasonableness . . . ."  To be clear, the Court is applying the more "deferential" standard applicable to contingent fee agreements rather than the "reasonable compensation" standard applicable to determining fee awards pursuant to fee shifting statutes.  In all candor, the amount approved would be lower were the Court to apply the "reasonable" compensation standard in this case.

Id. at 91.  As earlier indicated, rather than filing objections with the district court, Hawthorn appealed directly to the First Circuit, which dismissed the appeal on September 18, 2009.  On October 7, 2009, Hawthorn filed the present objections.  The government then filed a response in support of Magistrate Judge Collings' decision.[8]

DISCUSSION

Magistrate Judge Collings' ultimate ruling was based on a test drawn from Quint v. A.E. Staley Mfg. Co., 245 F. Supp. 2d 162 (D. Me. 2003), aff'd, 84 F. App'x 101 (1st Cir.

---

[8]Hawthorn filed a reply to the government's response expounding on his earlier arguments.

2003), and <u>Farmington Dowell Prods. Co. v. Forster Mfg. Co.</u>, 421 F.2d 61 (1st Cir. 1969).

These cases recognize the authority of a court in the exercise of its equitable discretion

to reform or annul unethically excessive contingent fee agreements.   However, as

Magistrate Judge Collings noted,

> unlike statutory fees, which normally are delimited to "reasonable" compensation, fee awards predicated upon fee arrangements privately negotiated between attorney and client are reviewed more deferentially; in the sense that [courts] will exercise [their] supervisory power to reduce a fee award predicated upon a fee agreement only in those "exceptional circumstances" where the fee assessed by counsel is "unethically excessive." <u>Quint v. A.E. Staley Mfg. Co.</u>, 84 Fed. Appx. 101, 102 (1st Cir. 2003) (per curiam) (unpublished) (quoting <u>Sargeant v. Sharp</u>, 579 F.2d 645, 648 n.4 (1st Cir. 1978), and citing <u>Venegas v. Mitchell</u>, 495 U.S. 82, 87-88 (1990)).

<u>Overseas Shipholding Group</u>, 547 F. Supp. 2d at 84-85.

Adhering to this distinction, Magistrate Judge Collings concluded that a court should

intervene in contingent fee arrangements between lawyers and clients only in exceptional

circumstances.   Quoting from <u>Farmington Dowell</u>, 421 F.2d at 90 (footnote omitted),

Magistrate Judge Collings noted the difference

> in over all complexity between the court's role in awarding a fee under [a fee-shifting statute] and in exercising its supervisory power over [contingency fee agreements].   The first requires the court to arrive at a figure it considers reasonable; the second requires it to arrive at a figure which it considers the outer limit of reasonableness.   The first determination is made without reference to any prior agreement between the parties; the second must take account of the fact that an agreement, if freely made, is not lightly set aside.

<u>Overseas Shipholding Group</u>, 547 F. Supp. 2d at 85, quoting <u>Farmington Dowell</u>, 421 F.2d

at 90.

The factors adopted by the First Circuit in <u>Farmington Dowell</u> as determining the

outer limit of the reasonableness of a fee include (but are not limited to):

(1)     the time and labor required, the novelty and difficulty of the questions involved and the necessary skill level;
(2)     whether work on the case would preclude the attorney's performing other work;
(3)     the customary charges of the Bar for similar services;
(4)     the amount involved in the controversy;
(5)     the contingency or the certainty of the compensation; and
(6)     the character of the employment, whether casual or for an established and constant client.

Id. at 89, adopting Farmington Dowell Prods. Co. v. Forster Mfg. Co., 297 F. Supp. 924, 926 n.1 (D. Me. 1969).[9]

In applying those factors he found relevant, Magistrate Judge Collings considered whether the APPS precluded contingent fee agreements (he concluded that nothing on the face of the statute did so);[10] whether the one-third agreement was reasonable when made (while he thought that the agreement might have been reasonable when first broached with Barroso, by the time it was signed a week before the sentencing hearing this was no longer the case – Hawthorn by then knew not only the likely outcome but also knew that there was little that he could do to influence matters if the government were to change its mind); whether the agreement was truly contingent (he found that the outcome was by no

_____

[9]The test is not to be applied strictly in hindsight for fear of penalizing an attorney for "a job well [and efficiently] done." Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A., 778 F.2d 890, 898 (1st Cir. 1985)

[10]Magistrate Judge Collings also had reservations about whether the Eastern District of Texas CJA Plan permitted parallel (or successive) representation under a CJA appointment and a contingent fee contract.  He stayed his decision and referred the issue to Judge Heartfield who, on June 13, 2008, opined that Hawthorn's contingency agreement was not incompatible with the Eastern District's CJA Plan (a matter which the government still contests).

means a certainty given the dismissal of the APPS counts in Texas, but that Hawthorn knew that he did not face the prospect of taking discovery or having to conduct a protracted trial);[11] whether Hawthorn had any special contribution to make if the government (or Judge Lindsay) were to reject an award for his clients (he thought not in that the only true contingency hinged on the government's recommendation at sentencing); whether the complexities of the case required special legal expertise (he concluded that it did not, at least on Hawthorn's part, who from the record was painfully unknowledgeable about whistleblowing statutes and environmental law in general); and finally, whether the award sought was grossly out of proportion to the actual work performed (he concluded that it was given that the bulk of Hawthorn's work consisted of "a few short months" in pursuit of Barroso's claim[12] and "about a week" of work on Altura's behalf with most of the work – filing a nine-page boilerplate memorandum, meeting with local counsel, and speaking briefly at the hearing – occurred during the two-week runup to the March 21, 2007 sentencing).[13]

---

[11]The APPS, although it provides for whistleblower awards (in the court's discretion) to persons "giving information leading to conviction," does not provide for a private qui tam right of action should the government not pursue the information provided.

[12]This may be too generous as Barroso did not formally agree to Hawthorn's representation for this purpose until the week before the hearing.

[13]In a footnote citing Dunn v. H.K. Porter Co., Inc., 602 F.2d 1105, 1110 (3d Cir. 1979), Magistrate Judge Collings recognized that the varying degrees of sophistication of the parties was an additional factor that the court might consider. See Overseas Shipholding Group, 547 F. Supp. 2d at 86 n.5. It is not clear from his decision the extent to which the lack of English language proficiency on the part of Barroso and Altura and their unfamiliarity with the United States legal system influenced his thinking. Magistrate Judge Collings was, however, clearly concerned by the communications disadvantage created by the confinement of Barroso and Altura on a ship at sea. Id. at 87.

Hawthorn does not dispute the chronology laid out by Magistrate Judge Collings. Rather, he contends that his request is not ethically excessive because he did more work on the case than is apparent from the record,[14] that the risk of Barroso and Altura going uncompensated by Judge Lindsay was greater than what Magistrate Judge Collings concluded, and that neither client had expressed disagreement with his fee.[15]  Finally, as a legal matter, Hawthorn asserts that the court has no authority to reform contingent fee agreements.[16]

As to the more general argument that a court lacks the supervisory authority to oversee and reform contingent fee contracts, the court simply disagrees.[17]  As stated in Richard A. Lord, 23 Williston on Contracts § 62:4 (4th ed. 2009) (footnotes omitted):

> [d]ue to the special nature of a contingent fee contract, which gives an attorney an interest in the outcome of the litigation and is most susceptible

---

[14]Magistrate Judge Collings acknowledged Hawthorn's claim in this regard but noted that in Barroso's case it could not be verified from the record and that in Altura's case it was implausible given the fact that Hawthorn's representation lasted barely a week.

[15]The government has filed with its response an email purportedly from Barroso dated June 16, 2009, thanking government attorneys for all that they were doing to prevent Hawthorn from taking an excessive fee.  The court has no reason to doubt the authenticity of the email but agrees with Hawthorn that it comes too late to be considered part of the record on review.

[16]Hawthorn also complains that Magistrate Judge Collings' determination that a $50,000 award was at the "outer limit of reasonableness" was factually unsupported. This is simply not the case.  Magistrate Judge Collings' decision is based on a meticulous review of the facts.  To the extent that Magistrate Judge Collings did not credit Hawthorn's assertion that his work for Barroso went far beyond what was disclosed on the record, Hawthorn failed to offer any corroboration for his undocumented extra services.

[17]The government appropriately cites United States v. Klubock, 832 F.2d 664 (1st Cir. 1987), for the proposition that the court has a general supervisory power over the ethical conduct of the bar that practices before it.

to improper influence and duress, the courts will closely review them.  In particular, they will scrutinize the agreement for reasonableness, paying special attention to the reasonableness of the amount of the fee.  In an important decision, the point was emphasized that the contingent fee contract "should always be subject to the supervision of a court, as to its reasonableness" and that contingent fees are to be closely scrutinized by the courts to ensure that the fee is neither unreasonable nor unconscionable. In supervising and interpreting these contracts, the courts are adamant in construing any ambiguity against the attorney who drew the agreement and liberally in favor of the client.

Apart from the authority cited by Magistrate Judge Collings, there is a raft of additional federal (and state court decisions) supportive of his conclusion.  See, e.g., Boston & Maine Corp., 778 F.2d at 896-897 ("Contingent fees are, of course, of special concern to courts and are subject to strict judicial supervision.");  In re Agent Orange Prod. Liab. Litig., 818 F.2d 226, 240 (2d Cir. 1987) ("It is well established that a district court, pursuant to its rule-making authority or on an *ad hoc* basis, may review a contingency fee agreement.");  McKenzie Constr., Inc. v. Maynard, 758 F.2d 97, 101 (3d Cir. 1985) ("Because courts have special concern to supervise contingent attorney fee agreements, they are not to be enforced on the same basis as ordinary commercial contracts.");  In re A.H. Robins Co., Inc., 86 F.3d 364, 373 (4th Cir. 1996) ("The district courts' supervisory jurisdiction over contingent fee contracts for services rendered in cases before them is well-established.");  Cappel v. Adams, 434 F.2d 1278, 1280 (5th Cir. 1970)  ("Canon 13 of the old Canons of Professional Ethics of the American Bar Association recognized the right of an attorney to contract for a contingent fee, but expressly made that right 'subject to the supervision of a court, as to its reasonableness.'");  Dean v. Holiday Inns, Inc., 860 F.2d 670, 673 (6th Cir. 1988) ("When a court is called upon to approve the settlement as is in

the best interest of the minor, it must consider and then determine what constitutes fair and

reasonable compensation to the attorney regardless of any agreement specifying an

amount, whether contingent or otherwise."); <u>Rosquist v. Soo Line R.R.</u>, 692 F.2d 1107,

1111 (7th Cir. 1982) ("[W]e cannot say that the judge abused his discretion by finding the

resulting fee under the [contingent] fee-contract ($813.57 per hour) to be unreasonable.");

<u>Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.</u>, 623 F.2d 1255, 1277 (8th Cir. 1980) ("The

court has the power and the responsibility to monitor contingency fee agreements for

reasonableness."); <u>Hamner v. Rios</u>, 769 F.2d 1404, 1407 (9th Cir. 1985) ("The existence

of a contingent fee agreement is but one element [for the court] to consider in analyzing

fee petitions."); <u>Cooper v. Singer</u>, 719 F.2d 1496, 1505 (10th Cir. 1983) (en banc),

<u>abrogated on other grounds by</u> <u>Venegas</u>, 495 U.S. 82.[18] Decisions of the Massachusetts

Supreme Judicial Court and the Texas Court of Appeals in their capacity as overseers of

---

[18]The one seemingly contrary case cited by Hawthorn, <u>Brown v. Watkins Motor Lines, Inc.</u>, 596 F.2d 129 (5th Cir. 1979), did not consider the court's supervisory power and in any event, as Judge Thornberry pointed out in dissent, the majority opinion was squarely contrary to existing Fifth Circuit law. Even assuming that the case was correctly decided, it is inapplicable here on its facts. <u>Brown</u> involved a diversity action based on Mississippi law. The fee-seeking attorney argued that because Mississippi did not recognize the merger of law and equity, the district court lacked the equitable power to oversee the distribution of funds paid into its registry on the minor plaintiff's behalf. The majority correctly rejected this argument and held instead that in the absence of a petition by any party, including the child's Alabama-appointed guardian disputing the distribution of the funds, no Article III case or controversy existed. As Judge Thornberry observed, there is no requirement that each step of the lawsuit be adversarial under Article III; it is sufficient that a case or controversy exist at the inception of the suit. Here there are no complicating issues of state law. The source of the whistleblower award rests entirely on federal law; the grant of the awards was a matter of discretion committed wholly to the district court, which explicitly reserved the right to review the amount of any attorney's fee sought under the award. Finally, to the extent that there need be an adversarial party, the presence of the United States as an objector to Hawthorn's fee request suffices, it having been the moving party before Judge Lindsay.

attorney conduct are to the same effect.  See Cambridge Trust Co. v. Hanify & King Prof'l

Corp., 430 Mass. 472, 480 (1999) ("A client may always challenge a fee which is 'plainly

unreasonable.'");[19] Brazos Elec. Power Co-op., Inc. v. Weber, 238 S.W.3d 582, 585-586

(Tex. App. 2007) (contingency fees, like other fee awards, are to be evaluated by the

factors set out in Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct).

Like Magistrate Judge Collings, I consider a $25,000 award under the contingent

fee agreements between Hawthorn and Barroso and Altura to approach, if not exceed, the

limits of reasonable compensation under the circumstances.  I will, however, defer to his

judgment in setting $25,000 as a baseline figure for an award.[20]   I have separate

reservations about  the award in Altura's case for a reason that was not raised in the

proceedings before Magistrate Judge Collings.

When Altura contacted Hawthorn by email on March 13, 2007, asking about the

---

[19]Upon admission pro hac vice to the Massachusetts District Court, Hawthorn became subject to Mass. R. Prof. Conduct 1.5 ("A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.").  Similarly Texas counsel are subject to Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct which requires attorneys to charge fees according to (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

[20]The government, I note, while it considers the sums "handsome" given how little work was actually performed by Hawthorn, does not challenge the baseline figure. Government's Opp., at 21.

upcoming sentencing hearing and the possibility of Hawthorn's representation, he prefaced the request with the statement that he was having difficulty reaching Harris, the attorney who had been appointed in the Eastern District of Texas to represent him.  Instead of making an effort to contact Harris or to assist Altura in doing so, Hawthorn immediately sent Altura a contingent fee contract while seeking a waiver of a conflict of interest from Barroso.  Hawthorn's conduct in this regard violated the spirit, if not the letter, of two, and perhaps three, attorney disciplinary rules.

Mass. R. Prof. C. 4.2 provides that "in representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."[21]  If there was any ambiguity about Harris's continuing representation of Altura, as Comment [6] to Rule 4.2 explains, an attorney is to be guided by Model Rule 4.3.  Part (b) of Rule 4.3 provides that: "During the course of representation of a client, a lawyer shall not give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of the client."  That Hawthorn understood the potential of a conflict is reflected by the fact that he immediately sought a waiver from Barroso.[22]  That Altura understood the meaning of a

---

[21]Rule 4.2 was adopted by the Supreme Judicial Court effective January 1, 1998, and is identical to the American Bar Association's Model Rule 4.2.  See Clark v. Beverly Health and Rehab. Servs., Inc., 440 Mass. 270, 274 n.5 (2003).

[22]It is not clear from the record that Hawthorn explained the significance of the waiver to Barroso.  Nor does it appear from the record that a waiver was ever obtained from Altura.

potential conflict or the significance of his signing the contingent fee contract (given his reliance on Barroso and a single email from Hawthorn) is extremely doubtful. <u>See</u> Mass. R. Prof. C. 7.3(b) ("A lawyer shall not solicit professional employment if: (1) the lawyer knows or reasonably should know that the physical, mental, or emotional state of the prospective client is such that there is a substantial potential that the person cannot exercise reasonable judgement in employing a lawyer . . . .").[23]

ORDER

For the foregoing reasons, the order of the Magistrate Judge is <u>AFFIRMED</u> in part, and <u>REVERSED</u> in part.  That portion of the April 22, 2008 Memorandum and Order awarding a fee of $25,000 from the whistleblower award to Barroso is <u>AFFIRMED</u>.  The award of a fee of $25,000 from the whistleblower award to Altura is <u>VACATED</u>, and no fee in Altura's case is approved.  The government is directed to make provision with the Clerk within forty-five (45) days of the date of this Order (unless a stay is granted in the interim by the Court of Appeals) for the direct payment of the awards to Barroso and Altura, less the $25,000 fee in Barroso's case, which will be paid to Hawthorn.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[23]Magistrate Judge Collings' comment that the circumstances of Barroso's engagement of Hawthorn suggest that being at sea "[he] was not fully at liberty to negotiate the terms of the contract, or to shop around for other representation," <u>Overseas Shipholding Group</u>, 547 F. Supp. 2d at 87, would seem to apply in spades to Altura.